Michael Douglas DAVIE, Plaintiff,

v.

Curtis WINGARD, et al., Defendants.

Civil Action No. C–2–95–513.

United States District Court,
S.D. Ohio,
Eastern Division.

March 6, 1997.

Michael D. Davie, Chillicothe, OH, pro se.

Todd Robert Marti, Ohio Atty. Gen., Corrections Litigation, Columbus, OH, for defendants.

## ORDER

GEORGE C. SMITH, District Judge.

Plaintiff Michael Douglas Davie, an inmate incarcerated by the Ohio Department of Rehabilitation and Correction, brings this action alleging that defendants have enforced the Department's grooming policy contrary to his religious beliefs, discriminated against him on the basis of his gender, and caused him mental anguish and violated other constitutional rights. This matter is before the Court on Magistrate Judge Abel's January 16, 1997 Report and Recommendation that defendants' May 31, 1996 motion for summary judgment be granted.

No objections to the Report and Recommendation have been filed. Upon de novo review as required by 28 U.S.C. § 636(b)(1)(B), the Court ADOPTS the Report and Recommendation. Defendants' May 31, 1996 motion for summary judgment is GRANTED. The Clerk of Court is DIRECTED to enter JUDGMENT for defendants. This action is hereby DISMISSED.

## REPORT AND RECOMMENDATION

ABEL, United States Magistrate Judge.

Plaintiff Michael Douglas Davie is an inmate currently incarcerated at the Ross Cor-

rectional Institution ("RCI"). He. brings this action against certain officials of the State of Ohio, and employees of the Madison Correctional Institution ("MCI"), where he was previously incarcerated. Plaintiff brings this action against Defendants in their official and individual capacities.

Plaintiff alleges that the enforcement of prison grooming policy contrary to his religious beliefs violates the Religious Freedom Restoration Act. Plaintiff also alleges that Defendants have discriminated against him on the basis of gender in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiff further alleges that Defendants have caused him mental anguish and violated other constitutional rights.

## FACTS

Mr. Davie claims that he is a "Nazarite," and that his religious beliefs center on the Nazarite vow, which appears in the Old Testament of the Bible, and provides:

> All the days of the vow of his separation there shall no razor come upon his head: until the days be fulfilled, in the which he separateth himself until the Lord, he shall be holy, and shall let the locks of the hair on his head grow.

*Numbers* 6:5.

Prison regulations include a grooming code for male inmates which provides in part:

> (D) .... Hair and hairstyle shall be clean, neatly trimmed and shall not extend over the ears or the shirt collar. Hair and hairstyle shall not protrude more than three inches from the scalp. ....
>
> ....
>
> (H) Forced haircuts shall only be given if the inmate is issued a conduct report by the rules infraction board determining that the hairstyle or length is contrary to this rule. .... Inmates shall conform their appearance to the standards set forth in this rule. Inmates refusing to do so shall be subject to appropriate disciplinary action, which may include requiring an inmate's hair to be cut or trimmed against his will.

Ohio Admin. Code § 5120–9–25.

Mr. Davie alleges that on January 23, 1995, he was summoned to come to Chaplain Josiah Opata's office to discuss his religious beliefs. Complaint § IV. After speaking with Chaplain Opata, Mr. Davie was ordered to get a hair cut by Chaplain Opata and C.O. J. May. Complaint § IV. Mr. Davie refused to allow his hair to be cut, on a religious basis. Complaint § IV. Mr. Davie was taken to Captain Harris' office and reprimanded for refusing to get a hair cut. Complaint § IV. Captain Harris ordered Mr. Davie to be removed to segregation. Complaint § IV.

On January 25, 1995, Mr. Davie appeared before Lt. Fisher, Mr. Smith and C.O. Lambert, members of the Rules Infraction Board, for disobedience of a direct order to get his hair cut. Complaint § IV. Mr. Davie was found guilty, and was penalized for the infraction. Complaint § IV. Mr. Davie was also referred to the Progressive Readjustment Inmate Development Environment ("PRIDE") unit, a behavioral modification training program. Complaint § IV. Mr. Davie was also forced to get a hair cut. Complaint § IV. On January 29, 1995, Mr. Davie filed an informal complaint with the Unit Manager Gasenheimer, and refused to eat or drink in protest of the infringement on his religious beliefs and placement in the PRIDE unit.

On February 5, 1995, Mr. Gasenheimer assured Mr. Davie that the Board's decision would be reviewed, and that Mr. Davie would probably be removed from the PRIDE unit. Complaint § IV. However, the Board's decision was upheld by Mr. Wingard, the Warden. Complaint § IV. Mr. Wingard's decision was appealed to the Director of the Department of Rehabilitation and Corrections ("ODRC"), Reginald Wilkinson. Complaint § IV. The Warden's decision was upheld by Defendant Wilkinson. Complaint § IV.

Mr. Davie alleges that placement in the PRIDE unit caused him mental anguish. Complaint Claim II, Count 1. Mr. Davie also alleges that he was denied adequate access to the law library while he was in the PRIDE

unit. Complaint Claim II, Count 3. Mr. Davie further alleges that legal documents from his lawsuit against MCI were stolen or misplaced by prison officials while he was in segregation. Complaint Claim II, Count 6. Mr. Davie also claims that he was denied physical exercise, participation in his culture, full commissary privileges, and reading materials of his choice while in the PRIDE unit. Complaint Claim II, Counts 4, 5.

## DISCUSSION

### I. MOTIONS FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The plain language of this rule mandates summary judgment against a party who fails to establish an essential element upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine issue of material fact. "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The standard for summary judgment mirrors that of Fed.R.Civ.P. 50(a) for a directed verdict; that is under the governing law, there can be but one reasonable conclusion as to the verdict. *Id.* at 252, 106 S.Ct. at 2512. On a motion for summary judgment, a court must view evidence in the light most favorable to the opposing party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

### II. PLAINTIFF'S CLAIM UNDER THE RELIGIOUS FREEDOM REFORMATION ACT

Mr. Davie argues that Defendants violated the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. RFRA provides that:

> (a) Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b) Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

> > (1) is in furtherance of a compelling government interest; and

> > (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000bb–1 (1994). Defendants argue that Mr. Davie's religious freedom has not been substantially burdened, and that even if there was a substantial burden, the policy must be upheld because it serves a compelling government interest in the least restrictive means possible.

#### A. *Substantial Burden*

In order to state a prima facie claim that a policy constitutes a substantial burden on free exercise, a plaintiff must show that the policy burdens a religious belief, rather than a philosophy or a way of life, and that the plaintiff sincerely holds the burdened belief. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). Although Defendants express doubt regarding the sincerity of Mr. Davie's beliefs, they are willing to assume for the sake of argument that the policy is a substantial burden on Mr. Davie's religious beliefs. Defendants maintain, however, that the policy serves compelling government interests through the least restrictive means. The Court will likewise assume that Mr. Davie's beliefs are sincere, and that the policy is a substantial burden, and analyze whether the policy serves compelling government interests through the least restrictive means.

### B. *Compelling Government Interests*

██ Defendants cite safety, security, and discipline as compelling government interests justifying the hair length regulations. Defendants offer evidence that ODRC is operating at 179.6% of the rated capacity of its institutions, the highest rate in the United States. Wilkinson Affidavit ¶ 3, Exhibit F to Defendants' Motion for Summary Judgment. Ohio has the second highest ratio of inmates to staff in the United States. Wilkinson Affidavit ¶ 3, Exhibit F to Defendants' Motion for Summary Judgment. In addition, 21.8% of the ODRC inmates are classified at close or high security, more than twice the national average of 9.5%. Wilkinson Affidavit ¶ 3, Exhibit F to Defendants' Motion for Summary Judgment. Given these statistics, security is of utmost importance to Ohio prison officials. This Court recently held that in a prison setting, safety and security are penological concerns of the "highest order." *Blanken v. ODRC*, 944 F.Supp. 1359, 1364–65 (S.D.Ohio1996). This Court therefore held that in a prison setting, safety and security constitute compelling government interests under RFRA. *See Id.; see also Johnson v. Zent*, No. 3:95cv7306, slip op. at 6 (N.D.Ohio Apr. 10, 1996).

Defendants have offered evidence that prohibiting inmates from growing long hair furthers compelling penological interests. For example, Defendants argue that long hair provides hiding places for contraband such as drugs and weapons. Russell Affidavit ¶ 3, Exhibit E to Defendants' Motion for Summary Judgment. Mr. Russell, warden of Lebanon Correctional Institution, testified that contraband has been found in the hair of Ohio inmates, even in the highest security portions of Ohio's highest security prison.[1] Russell Affidavit ¶ 3, Exhibit E to Defendants' Motion for Summary Judgment. Weapons are an obvious threat to prison security. Russell Affidavit ¶ 3, Exhibit E to Defendants' Motion for Summary Judgment. Drugs are a threat to prison security because they give inmates a means to obtain control over other inmates, and to corrupt prison staff. Russell Affidavit ¶ 3, Exhibit E to Defendants' Motion for Summary Judgment. Drugs also make inmates more difficult to control because drugs can alter an inmate's state of mind and cause changes in behavior.

If inmates were permitted to wear long hairstyles, prison staff would have to conduct more thorough and frequent searches, not only of inmates with long hair, but also of other inmates with whom these inmates have close contact, and any living areas occupied by the inmates. Russell Affidavit ¶ 5, Exhibit E to Defendants' Motion for Summary Judgment. More frequent and thorough searches would require increased physical contact between inmates and staff. Russell Affidavit ¶ 7, Exhibit E to Defendants' Motion for Summary Judgment. An increase in physical proximity between inmates and staff results in increased tension and a higher potential for staff injuries. Russell Affidavit ¶ 7, Exhibit E to Defendants' Motion for Summary Judgment.

Defendants also assert that hair styles are used by inmates as gang identifiers. Russel Affidavit ¶ 18, Meyer Affidavit ¶ 6, Exhibits E and G to Defendants' Motion for Summary Judgment. Gang identifiers are non-verbal means by which gang members indicate that they are affiliated with a particular gang. Russell Affidavit ¶ 16; Meyer Affidavit ¶ 4, Exhibits E and G to Defendants' Motion for Summary Judgment. Anything which allows inmates to deviate from uniform dress and grooming standards has the potential for being used as an identifier. Russell Affidavit ¶ 17; Meyer Affidavit ¶ 5, Exhibits E and G to Defendants' Motion for Summary Judgment.

Gang disputes are a significant cause of violence between inmates, and gang power detracts from the authority of prison staff. Russel Affidavit ¶ 14, Meyer Affidavit ¶ 2, Exhibits E and G to Defendants' Motion for

---

1. Mr. Davie notes that in Defendants' Answers to Plaintiff's Interrogatories, Defendants admitted they were aware of only three instances in the last six years where ODRC staff had found contraband hidden in an inmate's hair. Exhibit A to Plaintiff's Memorandum Contra. Given that there are approximately 44,000 inmates in the custody of ODRC, Mr. Davie argues that his risk is insignificant. Wilkinson Affidavit, ¶ 2, Exhibit F to Defendants' Motion for Summary Judgment. Defendants respond that much hidden contraband is undiscovered and unrecorded.

Summary Judgment. By using gang identifiers, gangs increase their solidarity and strength, and thus their power. Increases in gang power lead to violent conflicts with staff and among inmates, and leads to a destruction of staff authority. Russel Affidavit ¶ 14, Exhibit B to Defendants' Motion for Summary Judgment.

Defendants argue that suppressing gang identifiers is one of the most important tools used by ODRC to curb gang activity. Russel Affidavit ¶ 16, Exhibit E to Defendants Motion for Summary Judgment. Identifiers allow members of antagonistic gangs to identify each other for purposes of violent altercations. Russel Affidavit ¶ 16; Meyer Affidavit ¶ 4, Exhibits E and G to Defendants' Motion for Summary Judgment. New inmates also use gang identifiers to identify potential gang cohorts within the prison population. Russell Affidavit ¶ 16; Meyer Affidavit ¶ 4, Exhibits E and G to Defendants' Motion for Summary Judgment.

Defendants also argue that the hair length regulations further the compelling interest of keeping the public safe from the danger posed by escaped inmates. Russell Affidavit ¶ 22, Exhibit E to Defendants' Motion for Summary Judgment. Lang hair can obscure facial scars, blemishes, and wrinkles which are used to identity escapees. In addition, an inmate with long hair can dramatically alter his appearance upon escape by changing his hair length or style. Russell Affidavit ¶ 23, Exhibit E to Defendants' Motion for Summary Judgment. An inmate with long hair could alter his appearance multiple times after he escapes. Russell Affidavit 23, Exhibit E to Defendants' Motion for Summary Judgment. Such alterations can greatly impede efforts to identify the escapee. Russell Affidavit ¶ 23, Exhibit E to Defendants' Motion for Summary Judgment. Alterations in hair length or style would also diminish the value of prison photographs in informing the public. Russell Affidavit ¶ 23, Exhibit E to Defendants' Motion for Summary Judgment.

Other courts have considered similar arguments by prison officials and found them to be persuasive. The Eighth Circuit found that prison officials' arguments regarding inmates hiding contraband in their hair and using hair as a gang identifier were "valid and weighty concerns" that were based on the experience of prison administrators. *Hamilton v. Schriro*, 74 F.3d 1545, 1554–55 (8th Cir.1996). The same result was reached in *Abordo v. Hawaii*, 938 F.Supp. 656, 661 (D.Hi.1996), where the district court found that long hair was a threat to prison safety and security because inmates could hide contraband in their hair, and because more thorough searches provide additional opportunities for confrontations between inmates and staff. *See also Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir.1996); *Phipps v. Parker*, 879 F.Supp. 734, 735–36 (W.D.Ky.1995); *Diaz v. Collins*, 872 F.Supp. 353, 358 (E.D.Tex.1994). The courts in *Abordo, Harris, Phipps,* and *Diaz* found that prison hair length policies further the compelling interests of safety and security. Relying on the above analysis, the Magistrate Judge concludes that ODRC's hair length regulations further compelling interests. I will next consider whether the policy furthers the interests of safety and security through the least restrictive means.

## C. *Least Restrictive Means*

Defendants argue that the policy furthers the compelling interests of safety and security by the least restrictive means possible. In determining whether the policy meets RFRA's least restrictive means test, the Court must consider Congress' intent as to the interpretation of the statute. The legislative history of RFRA shows that Congress intended for Courts to defer to the judgment of prison officials in matters of security and discipline. The Senate Judiciary Committee report states:

> The committee does not intend the act to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline,

consistent with considerations of costs and limited resources.

S. Rep. 103–111, at 8–9 (1993). Therefore, the Magistrate Judge will give due deference to the judgment of ODRC regarding security issues. *See Blanken,* 944 F.Supp. 1359, 1367–68.

Defendants contend that there is no other effective way of dealing with the safety issues regarding long hair that does not create other pressing problems. Russel Affidavit ¶ 4, Exhibit E to Defendants' Motion for Summary Judgment. In regards to hidden contraband, metal detectors are expensive, and do not detect non-metallic contraband such as drugs and weapons made of wood, glass, or plastic. To search for non-metallic contraband, more thorough and frequent physical searches would have to be performed by prison staff. Such searches place increased demands on limited staff, and create tension between staff and inmates, increasing the potential for conflict. Russell Affidavit ¶ 4, Exhibit E to Defendants' Motion for Summary Judgment. Defendants contend that their resources do not permit increasing staff to compensate for these increased demands. Russel Affidavit ¶ 6, Exhibit E to Defendants' Motion for Summary Judgment.

Defendants also argue that there are no less restrictive means for suppressing the use of hair as a gang identifier. Defendants argue that the granting of exemptions from the hair length regulations would greatly complicate ODRC's ability to prevent the use of hair as a gang identifier. Russell Affidavit ¶ 21; Meyer Affidavit ¶ 9, Exhibits E and G to Defendants' Motion for Summary Judgment. It takes time for prison staff to learn that a certain hairstyle is a gang identifier. Russel Affidavit ¶ 21, Exhibit E to Defendants' Motion for Summary Judgment. In

the time it takes for prison staff to learn that a certain hair style is a gang identifier, gang problems could arise that could have been prevented. Although characteristics other than hair can be used as gang identifiers, prison officials lessen the possibilities by enforcing uniform dress and grooming codes.

It could be argued that Defendants could serve these goals by maintaining a policy which prohibits long hair, but provides exceptions for genuine religious beliefs. Defendants argue that enforcing uniformity in itself is necessary to maintain safety and discipline. Uniform treatment of prisoners is important to maintaining discipline. Russell Affidavit ¶ 9, Exhibit E to Defendants' Motion for Summary Judgment. Giving preferential treatment to individual inmates breeds resentment among other inmates, and makes them more difficult to control.[2] Russell Affidavit ¶ 9, Exhibit E to Defendants' Motion for Summary Judgment. Defendants also claim that inmates will engage in manipulative and duplicitous behavior in an attempt to obtain preferential treatment, and waste valuable staff resources on frivolous complaints. Russell Affidavit ¶ 9–10, Exhibit E to Defendants' Motion for Summary Judgment. Defendants argue that uniformity provides an element of structure to inmate's lives and reinforces that inmates must comply with prison rules. Russell Affidavit ¶ 13, Exhibit E to Defendants' Motion for Summary Judgment.

If exceptions to the policy were allowed, Defendants argue that other inmates would see the policy as unfair, and resent the inmates who received exemptions. Russel Affidavit ¶ 9, Exhibit E to Defendants' Motion for Summary Judgment. In *Abordo,* the court found that there was no reasonable alternative to a uniform hair length policy because inmates would perceive exceptions to

---

2. Mr. Davie has submitted a document containing the signatures of approximately 200 inmates from RCI, indicating that they are in favor of allowing religious exemptions to the hair length regulations, and that they would not have any resentment towards a person who was exempt from the policy. Exhibit F to Plaintiff's Motion for Summary Judgment. While these signatures detract somewhat from Defendants' argument, the Magistrate Judge finds that other factors raised by Defendants are sufficient to show that

the policy furthers the compelling interests of prison safety and security. Moreover, self-serving abstract declarations made by inmates are entitled to little weight compared with the judgment of experienced prison officials who have the day-to-day responsibility for providing a safe living environment for all inmates. Courts should give substantial deference to prison officials' hard-earned, practical judgments about security issues. *See* S. Rep. 103–111, at 8–9; *Blanken,* 944 F.Supp. 1359, 1367–68.

be arbitrary. *See* 938 F.Supp. at 662. In *Diaz,* the court similarly found that a uniform policy was the only way to control the problem of hiding contraband, and satisfied the least restrictive means requirement of RFRA. *See* 872 F.Supp. at 359. The court in *Phipps* found that requiring inmates to keep their hair short was the "only plausible way" to meet compelling safety concerns. 879 F.Supp. at 736. The *Phipps* court found that more thorough searches would be impractical and would be just as likely to burden constitutional interests. *Id.* The Northern District of Ohio has already held that ODRC's policy is the least restrictive means of preserving the government's interest in prison safety and security. *Williams v. Wilkinson,* No. 3:91–CV–7634, slip op. at 13 (N.D.Ohio May 16, 1996); *Johnson,* No. 3:95–CV–7306, slip op. at 6. This Court likewise finds that there is no less restrictive means that would address the safety concerns presented by Defendants. Accordingly, the Magistrate Judge **RECOMMENDS** that Defendants motion for summary judgment be granted as to Mr. Davie's RFRA claim.

## III. PLAINTIFF'S FIRST AMENDMENT CLAIM

 It is well settled that ODRC's grooming policy does not violate the First Amendment. *See Wakefield v. Baker,* No. 90–3370, 1991 WL 11248 (6th Cir. Feb.1, 1991); *Pollock v. Marshall,* 845 F.2d 656, (6th Cir. 1988); *Wellmaker v. Dahill,* 836 F.Supp. 1375 (N.D.Ohio 1993); *Walker v. Baker,* No. C2–90–832 (S.D.Ohio July 7, 1991). Therefore, Defendants are also entitled to summary judgment as to Mr. Davie's First Amendment claim.

## IV. PLAINTIFF'S EQUAL PROTECTION CLAIM

 Mr. Davie claims that Defendants have violated the Equal Protection Clause of the Fourteenth Amendment because female inmates are not required to keep their hair short. The hair length regulations for female inmates are identical to those for male inmates, except that the regulations for females provide that:

Hair and hairstyles shall be clean, neatly trimmed, and shall not extend below the middle back area in length. Hair length will be at least two inches in length, unless there is a medical concern. Hair and hairstyles shall not protrude more than three inches from the scalp.

Ohio Admin. Code § 5120–9–251(D).

A dispute exists as to the proper level of scrutiny to be applied when an inmate raises an equal protection claim in the context of gender discrimination. Some cases have held that a prison regulation is valid if it is "reasonably related to legitimate penological interests." *Star v. Gramley,* 815 F.Supp. 276 (N.D.Ill.1993) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987)). Other cases apply the intermediate level of scrutiny applied to gender-based classifications. *See Canterino v. Wilson,* 546 F.Supp. 174, 206–08 (W.D.Ky. 1982) (citing *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)). *See also Poe v. Werner,* 386 F.Supp. 1014, 1019–20 (M.D.Pa.1974) (applying intermediate scrutiny to a gender-based prison classification).

This Court was confronted with this issue in a recent case. *See Pariseau v. Wilkinson,* No. C2–92–1010 (S.D.Ohio Aug. 23, 1995). In *Pariseau,* this Court reviewed the cases cited above, and decided to apply intermediate scrutiny to a gender-based prison classification. *See Pariseau,* No. C2–92–1010, slip op. at 17–18. In order to withstand scrutiny under the intermediate level of review, defendants must show that the regulation is substantially related to an important government interest. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976).

As previously stated, the hair length regulations serve the compelling goal of promoting prison safety, security, and discipline. Defendants argue that the gender classification is justified because male inmates pose different issues of safety, security, and discipline when compared to female inmates. Defendants argue that female inmates pose less

of a security threat than male inmates. Wilkinson Affidavit ¶ 8, Exhibit F to Defendants' Motion for Summary Judgment.

Defendants offer several pieces of evidence to support their conclusion. Female inmates are less likely to be violent offenders than their male counterparts. Approximately 8% of ODRC's female inmates have been convicted of a violent crime, while 21% of male inmates have been convicted of violent crimes. Wilkinson Affidavit ¶ 7, Exhibit F to Defendants' Motion for Summary Judgment. Female inmates are much less likely to be classified in higher safety level classifications. Approximately 1% of female inmates are classified as close or maximum security, but 32% of male inmates are classified as such. Wilkinson Affidavit ¶ 8, Exhibit F to Defendants' Motion for Summary Judgment. Female inmates also have much lower homicide rates within prison than male inmates. During the years 1991, 1992, and 1993, no female inmates were involved in homicides while in custody of ODRC. Wilkinson Affidavit ¶ 9, Exhibit F to Defendants' Motion for Summary Judgment. During that same period, twelve male inmates were victims of homicides. Wilkinson Affidavit ¶ 9, Exhibit F to Defendants' Motion for Summary Judgment.

Female inmates are also less likely to escape than male inmates. No one has escaped from the Ohio Reformatory for Women since 1987. Wilkinson Affidavit ¶ 10, Exhibit F to Defendants' Motion for Summary Judgment. Between 1989 and 1993 there were 55 male inmates who escaped from ODRC institutions. Wilkinson Affidavit ¶ 10, Exhibit F to Defendants' Motion for Summary Judgment. Female inmates are less likely than male inmates to be involved in the production and hiding of contraband such as drugs or weapons. Wilkinson Affidavit ¶ 11, Exhibit F to Defendants' Motion for Summary Judgment. In regards to drugs, female inmates use drugs much less frequently than male inmates. Male inmates test positive in drug tests at more than three times the rate of female inmates. Wilkinson Affidavit ¶ 12, Exhibit F to Defendants' Motion for Summary Judgment. Because of these differences,

Defendants argue that the gender classification is justified.

In *Pariseau,* this Court held that the gender classification which exists in ODRC's hair regulation policy does not violate the Equal Protection Clause. *Pariseau,* No. C2–92–1010, slip op. at 25. The Court in *Pariseau* accepted Defendants' argument that the classification was justified because of the differences which existed between male and female inmates regarding the rate of violent behavior and escapes. *Pariseau,* No. C2–92–1010, slip op. at 21–22. The Magistrate Judge similarly finds that the gender classification is justified in Mr. Davie's case. The differences between male and female inmates that Defendants cite are the very characteristics which justify the policy, as applied to males, under RFRA. Therefore, the Court finds that the gender classification is substantially related to an important government interest, and Defendants are entitled to summary judgment as to Mr. Davie's claim under the Equal Protection Clause.

## V. PLAINTIFF'S OTHER CONSTITUTIONAL CLAIMS

Mr. Davie has alleged that actions of Defendants caused him mental anguish and violated his constitutional rights. These actions include: placement in the PRIDE unit, placement on 20 hour daily lock restrictions, harassment, denial of access to the law library, denial of physical exercise and preferred reading materials, denial of participation in his culture during February, and theft or misplacement of legal documents. Complaint § IV.

Defendants argue that they are entitled to summary judgment for these claims. First, Defendants argue that Mr. Davie's claim for emotional injury are barred by the Prison Litigation Reform Act of 1995. Second, Defendants argue that Mr. Davie's request for injunctive relief against Defendants from MCI is moot because Mr. Davie has been transferred to RCI. Third, Defendants argue that they are entitled to qualified immunity.

### A. *Prison Litigation Reform Act*

█ The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e

to require prisoners to exhaust administrative remedies before filing suit. Prison Litigation Reform Act, Pub.L. 104–134, codified as amended at 42 U.S.C. § 1997e (1996). The former provision directed district courts to stay proceedings and require a prisoner to exhaust administrative remedies "if the court believe[d] that such a requirement would be appropriate and in the interests of justice." 42 U.S.C. § 1997e(a)(1) (1994). Defendants argue that Mr. Davie's claims are barred because he has not shown that he has exhausted administrative remedies. Mr. Davie argues that the amendments do not apply to his claims because his case was filed before April 26, 1996, the date that the amendments were enacted. In addition, Mr. Davie's Complaint alleges that he exhausted administrative remedies before filing suit.

After the Rules Infraction Board ordered that Mr. Davie be placed in the PRIDE unit, Mr. Davie filed an informal complaint with the Unit Manager Gasenheimer. Mr. Gasenheimer reviewed Mr. Davie's complaint, but found that it was appropriate. Mr. Davie then made an appeal to the Warden, Mr. Wingard, who also found that the Board's decision was appropriate. Mr. Wingard's decision was appealed to the Director of ODRC, Reginald Wilkinson. The Warden's decision was upheld by Defendant Wilkinson. Exhibit L to Plaintiff's Memorandum Contra. This is the final step in the administrative grievance process. Accordingly, the Court finds that Mr. Davie has exhausted his administrative remedies, and Defendants' argument is without merit even if the amendment applied to Mr. Davie's claims.

Defendants argue that Mr. Davie's claims are also barred by another section of the PLRA. The PLRA added a new subsection to 42 U.S.C. § 1997e, which now provides:

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

PLRA, Pub.L. 104–134, codified as amended at 42 U.S.C. § 1997e(e) (1996). Mr. Davie argues that this section does not apply to him

because he filed his claim on May 22, 1995, almost a year before the PLRA was enacted. In order for the Court to apply the PLRA to Mr. Davie's claim, Defendants must show that the PLRA is retroactive. Defendants have not made any argument that this section is retroactive, but because the Magistrate Judge will recommend disposition of Mr. Davie's claims on the grounds of immunity, the issue is moot.

## B. *Eleventh Amendment Immunity*

Mr. Davie alleges that Defendants violated his constitutional rights. Claims for violations of constitutional rights are brought through 42 U.S.C. § 1983, which provides:

Every person who under color of [law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983 (1994). Section 1983 applies to "person[s]." 42 U.S.C. § 1983 (1994). The United States Supreme Court has held that a state is not a "person" for purposes of 42 U.S.C. § 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). The Court found that Congress did not intend to disturb the states' Eleventh Amendment immunity from suit when it enacted § 1983. *Id.* at 66, 109 S.Ct. at 2309–10.[3] Therefore, the Court interpreted § 1983 to be consistent with the Eleventh Amendment, and held that the term "person" in § 1983 does not include a state. *Id.*

■ To the extent a defendant is entitled to Eleventh Amendment immunity, the defendant is not a "person" within the meaning of § 1983. *See Grabow v. Southern State Correctional Facility*, 726 F.Supp. 537 (D.N.J.1989). Claims for monetary damages brought against state officials in their official capacities are considered suits against the state and hence are not claims against "person[s]" within the meaning of § 1983. *See*

---

3. The Eleventh Amendment bars suits against states in federal court. *See Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974).

*Will v. Michigan Dept. of State Police,* 491 U.S. 58 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). The Eleventh Amendment does not bar federal claims for prospective injunctive relief against state officials named in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). Such actions are not considered suits against the state. *See Id.* Mr. Davie has brought claims against Defendants in their official and individual capacities. Any § 1983 claims for monetary relief against Defendants in their official capacities are barred, and Defendants are entitled to summary judgment for these claims.

■ Mr. Davie's § 1983 claims for injunctive relief against Defendants in their official capacities, and all claims against Defendants in their individual capacities, are not barred by the Eleventh Amendment and are claims against a "person" within the meaning of § 1983. Defendants argue that Mr. Davie is not entitled to injunctive relief against MCI officials because he is no longer incarcerated there. The Court agrees that injunctive relief against MCI officials is not available to Mr. Davie. Therefore, Defendants Wingard, Opata, Harris, Fisher, Smith, Lambert, Parish, Gasenheimer, May, and Bayes are entitled to summary judgment as to Mr. Davie's claims for injunctive relief. Because Defendant Wilkinson is Director of ODRC, he still has authority over Mr. Davie, and Mr. Davie may be entitled to injunctive relief from him.

The only § 1983 claims that remain are those against Defendant Wilkinson, in his official capacity for injunctive relief, and in his individual capacity, and claims for monetary relief against all other Defendants in their individual capacities. Defendants argue that they are entitled to qualified immunity on these claims.

### C. *Qualified Immunity*

■ State officials who perform discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties if the official's actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Adams v.*

*Metiva,* 31 F.3d 375, 386 (6th Cir.1994). "The key inquiry in analyzing a claim of qualified immunity is whether the defendant's alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Birrell v. Brown,* 867 F.2d 956, 958 (6th Cir.1989)).

■ Once the defendant has raised the issue of qualified immunity, the burden is on the plaintiff to show that the defendants are not entitled to immunity. *See Adams,* 31 F.3d at 386. On summary judgment, the plaintiff's allegations must state a claim of violation of a clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *See Id.*

■ Mr. Davie must first meet a standard of pleading sufficient to state a claim. Recently, the Sixth Circuit Court of Appeals in *Veney v. Hogan,* 70 F.3d 917, 922 (6th Cir.1995), held that despite the liberality afforded pleading practice in federal courts with the adoption of Fed.R.Civ.P. 8, there is an elevated standard of pleading that is required of the plaintiff when the defense of qualified immunity is raised. The plaintiff is not required to meet the heightened pleading standard when the original complaint if filed. However, if qualified immunity is asserted by the defendant in the answer or in a motion to dismiss and the original complaint does not meet the heightened pleading standard, "the plaintiff must amend the complaint to include specific, nonconclusory allegations of fact that will enable the court to determine that those facts, if proved, will overcome the defense of qualified immunity." *Veney,* 70 F.3d at 922.

The plaintiff must come forth with specific factual allegations on the part of each defendant. *See Id.* To establish liability under § 1983, a plaintiff must plead and prove that a defendant is personally responsible for the unconstitutional actions which injured him.

*See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). The plaintiff must show that the individual defendant "is somehow personally at fault by actively participating in, encouraging or directing the commission of illegal acts by his subordinates." *Coffy v. Multi County Narcotics Bureau,* 600 F.2d 570, 580 (6th Cir.1979).

 Most of Mr. Davie's allegations do not indicate the perpetrator of the alleged conduct.[4] For example, Mr. Davie alleges that he is the victim of retaliatory harassment "from prison officials under the supervision of" Defendant Wingard.[5] Complaint § IV, Claim II, Count 2. Mr. Davie also alleges that legal documents were misplaced or stolen by "prison officials." Complaint Claim II, Count 6. In response to Defendants' motion for summary judgment, Mr. Davie has not offered allegations or evidence regarding the identity of the individuals who allegedly harassed him or stole his legal documents. As to these claims, Mr. Davie has not stated a claim or offered evidence of a constitutional violation.

 Mr. Davie also alleges that he was denied adequate access to the law library in violation of his constitutional right to access to the courts. *See Ex parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 641–42, 85 L.Ed. 1034 (1941). A prisoner's right to access to the courts includes adequate access to a law library or legal assistance. *See Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). In order to state a claim, inmates must show that they have been injured by the denial of this right. *See Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996). Mr. Davie has offered evidence that he was injured because of the prison's inadequate

library.[6] Mr. Davie alleges that he was injured because he was not aware of certain court rules because the prison library provided him with legal books with pages missing. Even if this inadequacy were below constitutional standards, Mr. Davie has not alleged that any individual defendant knew of the condition of these materials and deliberately deprived Mr. Davie of access to any legal materials. Mr. Davie has therefore not stated a claim for violation of his right to access to the courts.

 Mr. Davie also alleges that he was denied physical exercise while in the PRIDE unit. Complaint Claim II, Count 4. The only evidence offered by Mr. Davie regarding this denial is the PRIDE Manual, which provides that "[t]here will be *no* gymnasium recreation privileges. Recreation will occur in the dayroom, (card playing; and exercise equipment)." PRIDE Manual, Exhibit K to Plaintiff's Memorandum Contra. He has not informed the Court of the specific limitations, such as the amount of time allotted, on his physical exercise. Every limitations on a prisoner's physical exercise does not violate the constitution, and Mr. Davie has not provided sufficient facts for this Court to determine whether a constitutional violation has occurred. *See Rodgers v. Jabe,* 43 F.3d 1082 (6th Cir.1995); *Patterson v. Mintzes,* 717 F.2d 284 (6th Cir.1983); *Walker v. Mintzes,* 771 F.2d 920 (6th Cir.1985). Therefore, Mr. Davie has not met his burden of responding to Defendants' defense of qualified immunity, and Defendants are entitled to summary judgment on this claim.

 Mr. Davie also alleges that he was denied participation in his culture during the month of February, denied reading materials of his choice, and denied full commissary

---

4. Mr. Davie did not amend his complaint in response to Defendants' assertion of qualified immunity in Defendants' answer. Claim II of Mr. Davie's complaint fails, except in regards to Mr. Davie's placement in the PRIDE unit, to provide the Court with evidence of the conduct of specific individual Defendants.

5. This allegation does not state a claim against Defendant Wingard because § 1983 does not create *respondeat superior* liability.

6. On February 23, 1994, the Court of Appeals of Summit County, Ohio affirmed Mr. Davie's criminal conviction. On March 20, 1995, Mr. Davie filed an application to reopen his appeal. The application was denied because he failed to attach a sworn statement of the basis for the claim as required by Ohio Appellate Rule 26(B)(2)(d). He appealed this order to the Supreme Court of Ohio, but his appeal was denied because it was untimely. Exhibit M to Plaintiff's Memorandum Contra.

privileges. Complaint Claim II, Counts 4 and 5. Again, Mr. Davie has not provided this Court with details as to who denied him these privileges, and when and how they occurred. Mr. Davie has not met the heightened pleading standard required by *Veney*. These counts therefore do not state a constitutional claim. The Court finds that Mr. Davie has not stated a constitutional claim under the Eighth Amendment, and Defendants are entitled to summary judgment as to these counts.

■ Mr. Davie has provided evidence regarding conduct of individual defendants for one count of his Complaint. In Count One of Claim II, Mr. Davie alleges that Defendants Fisher, Lambert, Smith, Gasenheimer and Parrish violated his Eighth Amendment right to be free from cruel and unusual punishment by causing Mr. Davie to be placed in the PRIDE unit, and by placing him on 20–hour daily lock restrictions.

■ The Eighth Amendment applies to acts which are "punishment." *Ingraham v. Wright*, 430 U.S. 651, 670 n. 39, 97 S.Ct. 1401, 1412 n. 39, 51 L.Ed.2d 711 (1977). In *United States v. Harper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) the Supreme Court held that to determine whether a sanction was punitive, a court must engage in a "particularized assessment of the penalty imposed and the purpose that the penalty may fairly be said to serve." *Id.* at 448, 109 S.Ct. at 1901. The goals served by the civil sanction must be evaluated to determine whether the sanction serves a remedial purpose rather than solely serving as retribution or a deterrent. Accordingly, the Court will evaluate the purpose of the PRIDE program. The PRIDE Manual states:

The P.R.I.D.E. Unit has the following objectives:

To create a structured residential environment for those inmates who have an inability to adjust to Institutional living, concerning rules and regulations, but have not become chronic in their ability to adjust.

To provide an atmosphere of structured living necessary to address the needs of the inmates as determined by their actions, referrals by R.I.B. Chairman, unit staff,

other Institutional employees, and/or the Hearing Officer.

To provide a preventative strategy that will defer inmate negative behavior. Providing a positive approach to dealing with Institutional living and abiding by rules and regulations.

To provide a highly regimented and structured environment that will not be brutal or demeaning to the inmates and, at the same time, be a productive and positive experience that will help divert them from being placed in the disciplinary control unit.

PRIDE Manual at 3, Exhibit K to Plaintiff's Memorandum Contra. The PRIDE Manual further provides that "the ultimate goal" of the program for its participants is "becoming alert, respectful of authority, respectful of self and others who have not assumed personal responsibilities, all of which will afford the inmate a positive attitude." PRIDE Manual at 4, Exhibit K to Plaintiff's Memorandum Contra.

The PRIDE Manual also states several ways that the program will benefit its participants:

Techniques will be used to replace irresponsible and destructive attitudes with constructive and positive ones, benefiting the inmate, and the Institution by reducing the number of [ir]responsible inmate[s].

Inmates who successfully complete [the program] ... will benefit where by (sic) the P.R.I.D.E. unit staff will have latitude to make recommendations for specific jobs.

Inmates who successfully complete [the program] ... will benefit by receiving a letter which will be placed in the inmate[']s unit file. P.R.I.D.E. unit records are [one] of [the] items which the Parole Board reviews in determining your adjustment to institutional living.

PRIDE Manual at 5, Exhibit K to Plaintiff's Memorandum Contra. When Mr. Davie filed his complaint regarding his placement in the PRIDE unit, Defendant Gasenheimer responded that "The PRIDE program is not a disciplinary unit. The purpose of the program is for behavior modification for those who are unable to adjust to institutional life."

Informal Complaint Resolution, Exhibit K to Plaintiff's Memorandum Contra.

The evidence shows that the primary purpose of the PRIDE program is not punitive. The purpose of the program is to help inmates adjust to institutional life and improve their attitudes in behavior so that they can avoid discipline in the future. Because the purpose of the PRIDE program is not punitive, it is not a punishment within the meaning of the Eighth Amendment. Therefore, the Eighth Amendment is not applicable, and Mr. Davie has not stated a claim of a constitutional violation for this claim.

■ Mr. Davie alleges in his Complaint that he was subject to cruel and unusual punishment by being placed in 20-hour lockdown restriction daily. Complaint Claim II, Count 1. Only "unnecessary and wanton infliction of pain" implicates the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). A prisoner bringing such a claim must allege deliberate indifference to serious needs. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Eighth Amendment claims "mandate inquiry into a prison official's state of mind" because the infliction of punishment must be deliberate to be actionable. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Mr. Davie has not offered any evidence of the circumstances surrounding this restriction. He has not named the defendant who ordered the restriction, nor has he offered any evidence to show that Defendants were deliberately indifferent to his rights. The Court therefore finds that Mr. Davie has not offered evidence of a violation of the Eighth Amendment which defeats Defendants' claim of qualified immunity.

## VI. CONCLUSION

The Magistrate Judge **RECOMMENDS** that Defendants' May 31, 1996 motion for summary judgment (Doc. 30) be **GRANTED** and that **JUDGMENT** be entered in favor of Defendants.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1)(B); Rule 72(b), Fed. R.Civ.P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn,* 474 U.S. 140, 150–152, 106 S.Ct. 466, 472–73, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). *See also, Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).